SMS/2022R00922

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Kevin McNulty |
| | : | |
| v. | : | Criminal No. 23-256 |
| | : | |
| JORDAN BUNNELL | : | 18 U.S.C. § 371 |
| | : | 18 U.S.C. § 1349 |

## I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, the Attorney for the United States for the District of New Jersey, acting under authority conferred by 28 U.S.C. § 515, charges:

## COUNT ONE
## (Conspiracy to Violate the Anti-Kickback Statute)

1.      Unless otherwise indicated, at all times relevant to this Information:

### The Defendant and Other Individuals and Entities

a.      Defendant JORDAN BUNNELL ("defendant BUNNELL") was a resident of Utah.

b.      ANDREW MCCUBBINS ("MCCUBBINS"), a co-conspirator not charged in this Information, was a resident of Utah.

c.      Defendant BUNNELL and MCCUBBINS owned, operated, and had a financial interest in a marketing call center ("Call Center-1"), a clinical laboratory ("Laboratory-1"), and a telemedicine company ("Telemedicine Company-1") that conducted or arranged for a variety of medical tests (collectively, the "Testing Companies"). Defendant BUNNELL, MCCUBBINS, and

others paid kickbacks and bribes to various parties (the "Suppliers") in exchange for referrals and orders for genetic cancer screening tests ("CGx Tests") for beneficiaries of the Medicare program and other health care benefit programs, without regard for medical necessity.

d.    Laboratory-1 was enrolled as a Medicare supplier and authorized to bill Medicare for the medical tests described below. Pursuant to the requirements described below, Laboratory-1 was also responsible for acknowledging that any claims made to Medicare complied with the relevant laws, regulations, and program instructions.

**<u>Suppliers of Referrals and Orders for CGx Tests</u>**

e.    AARON WILLIAMSKY ("WILLIAMSKY") and NADIA LEVIT ("LEVIT"), co-conspirators not charged in this Information, were each residents of New Jersey. WILLIAMSKY and LEVIT had relationships with numerous Suppliers who they arranged to provide referrals and orders for CGx Tests to defendant BUNNELL in exchange for a portion of kickbacks, including but not limited to the following Suppliers:

i.    CHRISTIAN MOHASES ("MOHASES") and ADAM OWENS ("OWENS"), co-conspirators not charged in this Information, were residents of California. MOHASES and OWENS jointly owned, operated, and had a financial interest in call centers (the "MOHASES/OWENS Supply Companies") through which MOHASES, OWENS, and others obtained information related to potential patients for CGx Tests. The MOHASES/OWENS Supply Companies, in turn, provided this information to the Testing Companies and other entities that

performed CGx Tests in exchange for kickbacks and bribes from these companies.

ii.     LUIS ROA a/k/a LOUIS ROA ("ROA"), a co-conspirator not charged in this Information, was a resident of Chile. ROA owned and operated multiple call centers (the "ROA Supply Companies") through which ROA and others obtained information related to potential patients for CGx Tests. The ROA Supply Companies, in turn, provided this information to the Testing Companies and other entities that performed CGx Tests in exchange for bribes from these companies.

**Background on the Medicare Program and Genetic Testing**

f.     Medicare was a federal program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare was a "health care program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f). The Medicare Part B program was a federally funded supplemental insurance program that provided Medicare insurance benefits for individuals aged 65 or older, and for certain individuals who were disabled. The Medicare Part B program paid for various medical services for beneficiaries, including CGx Tests.

g.     Genetic tests were laboratory tests designed to identify specific inherited mutations in a patient's genes. These genetic variations affected a patient's risk of developing certain diseases or how the patient

responded to medications. CGx Tests were genetic tests related to a patient's hereditary predisposition for cancer.

h.      To conduct a genetic test, a laboratory had to obtain a DNA sample from the patient. Such samples were typically obtained from the patient's saliva by using a cheek (buccal) swab to collect sufficient cells to provide a genetic profile. The DNA sample was then submitted to the laboratory for analysis, such as CGx Tests.

i.      If the patient had insurance, the laboratory would typically submit a claim for reimbursement for the test to the patient's insurance carrier. Reimbursement rates for CGx Tests sometimes exceeded approximately $8,000 per test.

j.      Medicare excluded from coverage diagnostic genetic tests "that are not reasonable and necessary . . . [f]or the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 411.15(k)(1). To be considered "reasonable and necessary," Medicare rules required that genetic testing "be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

k.      In order for a healthcare provider to bill Medicare for services rendered, it had to enroll with Medicare as a Medicare provider or "supplier." For

example, in order to bill Medicare for a CGx Test, a clinical laboratory was first required to complete and submit a Form CMS-855B, the Medicare Enrollment Application for "Clinics/Group Practices and Certain Other Suppliers."

        l.    As provided in the Form CMS-855B, in order to enroll with Medicare, a supplier of healthcare services such as a clinical laboratory had to, among other things, certify the following: (1) the supplier understood that any deliberate omission, misrepresentation, or falsification of any information on the Form CMS-855B could be punished by criminal, civil, or administrative penalties; (2) the supplier agreed to abide by applicable Medicare laws, regulations and program instructions, such as, but not limited to, the federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)) ("AKS"); (3) the supplier understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions; and (4) the supplier had to refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

        m.    Medicare-authorized suppliers of healthcare services, such as clinical laboratories, could only submit claims to Medicare for reasonable and medically necessary services. Medicare would not reimburse claims for services that it knew were procured through kickbacks or bribes. Such claims were deemed false and fraudulent because they violated Medicare laws, regulations, and program instructions, as well as violated federal criminal law. For example,

where a CGx Test was procured through the payment of a kickback in violation of the AKS, a claim to Medicare for reimbursement for that test was fraudulent. By implementing these restrictions, Medicare aimed to preserve its resources, which were largely funded by United States taxpayers, for those elderly and other qualifying beneficiaries who had a genuine need for medical services.

### Telemedicine

n.     Telemedicine allows health care providers to evaluate, diagnose, and treat patients remotely—without the need for an in-person visit—by using telecommunications technology, such as the internet or telephone to interact with a patient.

o.     Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements were met. These requirements included, among others, that: (a) the beneficiary was located in a rural area (outside a metropolitan area or in a rural health professional shortage area); (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a licensed provider's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

p.     Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were

reasonable and medically necessary to diagnose and treat a covered illness or condition.

## TRICARE

q.      TRICARE was a health care program of the United States Department of Defense ("DoD") Military Health System that provided coverage for DoD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.

r.      TRICARE was a "health care benefit program," as defined by Title 18, United States Code, § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, § 1320a-7b(f), that affected commerce.

## CHAMPVA

s.      The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health benefit program within the Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the

surviving spouse or child of a veteran who died from a VA-rated service-connected disability.

t.      In general, the CHAMPVA program covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims had to have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

u.      CHAMPVA was a "health care benefit program," as defined by Title 18, United States Code, § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, § 1320a-7b(f), that affected commerce.

## The Conspiracy

2.      From in or around October 2018 through in or around July 2019, in the District of New Jersey, and elsewhere, defendant

## JORDAN BUNNELL

did knowingly and intentionally conspire and agree with others to commit offenses against the United States, that is, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service, and to order or arrange for or recommend ordering of any

item or service, for which payment may be made in whole or in part under a Federal health care program, namely Medicare, TRICARE, and CHAMPVA, contrary to Title 42, United States Code, Sections 1320a-7b(b)(2)(A), (B).

### Goal of the Conspiracy

3.     The goal of the conspiracy was for defendant BUNNELL and his co-conspirators to profit by causing the submission of false and fraudulent claims for CGx Tests to federal and private health care benefit programs that had been procured through the payment of kickbacks and bribes.

### Manner and Means of the Conspiracy

4.     The manner and means by which defendant BUNNELL and others sought to accomplish the goal of the conspiracy included, among other things, the following:

a.     Defendant BUNNELL and others conspired to engage in a fraudulent kickback scheme whereby the Testing Companies paid Suppliers—including but not limited to WILLIAMSKY, LEVIT, MOHASES, OWENS, and ROA—who in turn provided, either directly or indirectly, the Testing Companies with information amounting to a guarantee that a CGx test would be conducted through Laboratory-1, and thereafter reimbursed by Medicare and other federal and private health care benefit programs.  This category of information, referred to herein as a "qualified patient lead," identified individuals who were (i) covered by Medicare; (ii) eligible for a reimbursement from Medicare for the relevant test; and (iii) thereafter had a completed test kit processed by Laboratory-1 and billed to Medicare. The Testing Companies paid the Suppliers kickbacks for each

qualified patient lead that resulted in a reimbursement, regardless of medical necessity.

b.     In order to generate qualified patient leads, Suppliers used a variety of methods, including making cold calls, using targeted Internet advertisements, and making in-person solicitations for various medical services to elderly Medicare beneficiaries across the United States. Through the Suppliers, targeted beneficiaries were questioned to determine whether they met certain eligibility requirements for the relevant test. Once an eligible beneficiary was identified, that individual's information was passed to the Testing Companies and others as part of a qualified patient lead. The Testing Companies operated an online portal (the "Portal") through which Suppliers uploaded qualified patient leads directly to the Testing Companies.

c.     After receiving qualified patient leads for likely candidates for reimbursement, the Testing Companies worked with a network of telemedicine health care providers—including health care providers associated with Telemedicine Company-1—who reached out to the beneficiaries named in the qualified patient leads submitted by the Suppliers. Those health care providers were not treating the beneficiaries for any symptoms or conditions, but were instead operating with the objective of providing those pre-screened beneficiaries with prescriptions for the relevant tests. In other circumstances, other Suppliers had their own independent relationships or arrangements with health care providers who could write prescriptions to follow up on a qualified patient lead.

In those cases, a doctor's order for the beneficiary was passed to the Testing Companies.

        d.     Once the Testing Companies obtained prescriptions generated through the qualified patient lead process, testing kits were sent to the beneficiaries. Beneficiaries then completed the buccal swab or other testing mechanism contained in the kit and returned it to Laboratory-1. Ultimately, Laboratory-1 electronically submitted or caused the electronic submission of claims to Medicare, TRICARE, CHAMPVA, and other health care benefit programs for payment for each of the tests. Laboratory-1 paid kickbacks to Suppliers for each test kit that was returned to the lab and processed, and subsequently billed to Medicare and other health care benefit programs.

        e.     In order to conceal the kickback arrangements with MOHASES, OWENS, ROA, and others, Laboratory-1 wired some of the kickback payments owed to WILLIAMSKY and his associated Suppliers (MOHASES, OWENS, ROA, and others) to a shell company controlled by WILLIAMSKY located in New Zealand (the "New Zealand Company"). MOHASES, OWENS, ROA, and others entered into sham contracts with the New Zealand Company in order to make it appear that the MOHASES/OWENS Supply Companies, the ROA Supply Companies, and others were engaged in and being paid for legitimate marketing and referral services for the New Zealand Company (the "NZ CGx Agreements"). The NZ CGx Agreements provided that the New Zealand Company would pay the MOHASES/OWENS Supply Companies, the ROA Supply Companies, and others for marketing services based on the hours and expenses incurred. In reality,

however, Laboratory-1, via the New Zealand Company, paid WILLIAMSKY, the MOHASES/OWENS Supply Companies, the ROA Supply Companies, and others on a per-CGx Referral basis that resulted in payment from Medicare.

      f.    In an attempt to conceal the true nature of the NZ CGx Agreements, the MOHASES/OWENS Supply Companies, the ROA Supply Companies, and others generated false invoices for hourly referral services for the New Zealand Company and sent them to Laboratory-1 and/or the New Zealand Company. The New Zealand Company, in turn, wired the kickback payments to MOHASES and other Suppliers. In reality, the Suppliers performed no services for the New Zealand Company. In this manner, the Testing Companies wired approximately $6,605,046.40 in kickback payments for Suppliers associated with WILLIAMSKY and LEVIT to the New Zealand Company for which the New Zealand Company had performed no services.

      g.    From in or around October 2018 through in or around July 2019, defendant BUNNELL and his co-conspirators caused a loss to Medicare, TRICARE, and CHAMPVA of at least approximately $89,137,434 from the CGx Test scheme described.

## Overt Acts

5.    In furtherance of the conspiracy, and in order to effect the goal thereof, defendant BUNNELL and others committed or caused the commission of the following overt acts in the District of New Jersey and elsewhere:

      a.    From on or about January 2, 2019, through on or about January 8, 2019, one of the MOHASES/OWENS Supply Companies submitted

to the Portal information identifying approximately three Medicare beneficiaries located in New Jersey for whom the company possessed qualified patient leads for CGx Tests that MOHASES and OWENS sought to have processed by Laboratory-1 in exchange for kickbacks.

b.      On or about January 15, 2019, OWENS emailed defendant BUNNELL a sham invoice reflecting a request for kickback payments of $54,000 for CGx Tests, which the invoice purported to be for "Marketing Services" and "Processing Services" performed by one of the MOHASES/OWENS Supply companies.

c.      On or about January 22, 2019, WILLIAMSKY and his co-conspirators caused the New Zealand Company to wire a kickback payment of approximately $54,000 to MOHASES and OWENS (through one of the MOHASES/OWENS Supply Companies).

d.      On or about February 18, 2019, defendant BUNNELL caused approximately $500,087 in kickback payments to be wired to the New Zealand Company.

e.      On or about February 19, 2019, WILLIAMSKY and his co-conspirators caused the New Zealand Company to wire a kickback payment of approximately $84,000 to MOHASES and OWENS (through one of the MOHASES/OWENS Supply Companies).

f.      On or about February 26, 2019, WILLIAMSKY and his co-conspirators caused the New Zealand Company to wire a kickback payment of approximately $33,053 to ROA (through one of the ROA Supply Companies).

g.      On or about March 27, 2019, ROA submitted to the Portal information identifying approximately four Medicare beneficiaries located in New Jersey for whom ROA possessed qualified patient leads for CGx Tests that ROA sought to have processed by Laboratory-1 in exchange for kickbacks.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
## (Conspiracy to Commit Health Care Fraud)

6.     The allegations in Paragraphs 1 and 3 through 5 of Count One are realleged here.

7.     From in or around October 2018 through in or around July 2019, in the District of New Jersey, and elsewhere, defendant

**JORDAN BUNNELL**

did knowingly and intentionally conspire and agree with others to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money owned by, and under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of or payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

## Goal of the Conspiracy

8.     The goal of the conspiracy was for defendant BUNNELL and others to unlawfully enrich themselves by submitting or causing the submission of false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and other health care benefit programs.

## Manner and Means

9.     It was part of the conspiracy that:

a.     As described in paragraphs 1 and 3 through 5 of Count One, defendant BUNNELL and others offered and paid kickbacks to Suppliers in

exchange for medically unnecessary CGx Tests and qualified patient leads for CGx Tests.

       b.     As a result, defendant BUNNELL, through Laboratory-1, submitted and caused the submission of false or fraudulent claims to Medicare, TRICARE, and CHAMPVA for CGx Tests that were procured through the payment of kickbacks and were not medically necessary.

      All in violation of Title 18, United States Code, Section 1349.

**COUNT THREE**
**(Conspiracy to Commit Wire Fraud)**

10.     The allegations in Paragraphs 1, 3 through 5, and 8 through 9 of Counts One and Two are realleged here.

11.     From in or around October 2018 through in or around July 2019, in the District of New Jersey, and elsewhere, defendant

**JORDAN BUNNELL**

did knowingly and intentionally conspire and agree with others to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice to defraud, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

**Goal of the Conspiracy**

12.     The goal of the conspiracy was for defendant BUNNELL and others to unlawfully enrich themselves by submitting and causing the submission of false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and other health care benefit programs.

**Manner and Means**

13.     It was part of the conspiracy that:

        a.      As described in paragraphs 1 and 3 through 5 of Count One and paragraphs 8 through 9 of Count Two, defendant BUNNELL and others

17

offered and paid kickbacks to Suppliers in exchange for medically unnecessary CGx Tests and qualified patient leads for CGx Tests.

b.      As described in paragraph 5, defendant BUNNELL and others paid kickbacks through wire transfers, including international wire transfers to the New Zealand Company.

c.      As a result, defendant BUNNELL, through Laboratory-1, submitted and caused the submission of false or fraudulent electronic claims to Medicare, TRICARE, and CHAMPVA for CGx Tests that were procured through the payment of kickbacks and were not medically necessary.

All in violation of Title 18, United States Code, Section 1349.

## <u>FORFEITURE ALLEGATIONS</u>

14.     Upon conviction of the offenses alleged in Counts One and Two of this Information, defendant BUNNELL shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real or personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses (as defined in 18 U.S.C. § 24) alleged in this Information, which was at least approximately $89,137,434.

15.     Upon conviction of the offense alleged in Count Three of this Information, defendants BUNNELL shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such conspiracy offense, and all property traceable to such property.

## <u>SUBSTITUTE ASSETS PROVISION</u><br><u>(Applicable to All Forfeiture Allegations)</u>

16.      If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)      cannot be located upon the exercise of due diligence;

      (b)      has been transferred or sold to, or deposited with, a third person;

      (c)      has been placed beyond the jurisdiction of the Court;

      (d)      has been substantially diminished in value; or

      (e)      has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant

to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

VIKAS KHANNA
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

**CASE NUMBER: 23-_____**

---

**United States District Court**
**District of New Jersey**

---

**UNITED STATES OF AMERICA**

**v.**

**JORDAN BUNNELL**

---

**INFORMATION FOR**

**18 U.S.C. § 371**
**18 U.S.C. § 1349**

---

**VIKAS KHANNA**
*Attorney for the United States*
*Acting Under Authority Conferred*
*By 28 U.S.C. § 515*
*Newark, New Jersey*

---

Sean M. Sherman
*Assistant U.S. Attorney*
*973-645-2733*

---